Whitakek, Judge,
delivered the opinion of the court:
Plaintiff sues for the difference between the amount it has been paid for the carriage of certain ammunition and the amount it says it is entitled to.
From August 12, 1942, through August 6, 1948, plaintiff transported for the Navy numerous shipments of ammunition with explosive bullets for use in a gun known as “20 M/M Automatic Gun A/N-M2,” from Elkton, Maryland, to Nixon, New Jersey. Plaintiff described the shipments on the bills of lading as “Ammunition For Small Arms With Explosive Bullet (Loaded 20 M/M Shells) ” or as “Ammunition for Small Arms With Explosive Bullet (20 M/M H. E. I. AA Complete Bounds)”, as published in Middle Atlantic States Motor Carrier Conference, Inc., Freight Tariffs, Series 10, MF-I. C. C., Nos. A-66 and A-106. The rate charged was that applicable to “Ammunition, Explosive, Incendiary or Gas, Smoke or Tear Producing: Ammunition, fixed, N. O. I. for cannon, vol., min. wt. 30,000 lbs.”
The applicable tariff is what is known in the record as “Agent Jackson’s No. 12,” as modified by the tariff mentioned above. This tariff sets out the following with reference to items 23,25, 28,29, and 30:

*588

“Dl” in the column headed “Rating” means that for less than truckload shipments the rate is double the first class rate, and the designation “1” after “Ammunition, fixed, N. O. I., for cannon,” means the first class rate. This rate would have been applicable except for the fact that the plaintiff participated in Middle Atlantic States Motor Carrier Conference, Inc., tariffs “MF-I. C. C. Nos. A-66 and A-106,” which were designated as “exceptions to National Motor Freight Classification No. 6, East.” These exceptions provided that the rate applicable for truckload shipments of ammunition for cannon should be 75 percent of the first class rate. Plaintiff contends that this is the proper rate covering the shipments.
Defendant contends that the applicable rate is contained in item 30 of Agent Jackson’s No. 12, which reads: “Cartridges, small arm, blank or loaded, in boxes: Vol., min. wt. 30,000 lbs.,” with a rating of “4-5-4.” This rating means that such shipments carry the fourth class rate in the eastern territory, the fifth class rate in southern territory, and the fourth class rate in western territory. The above mentioned “Exceptions to National Motor Freight Classification No. 6, East” also provided for a rate of 75 percent of the fourth or fifth class rate on “Cartridges, small arm, blank or loaded, in boxes.”
If the plaintiff is correct, the rate in cents would have been 51 cents per hundred pounds, and if the defendant is correct, the rate would have been 34 cents. The difference in dollars is $12,821.23. Defendant, however, admits liability for $217.76 of this amount.
*589 The question presented is the proper classification of ammunition for a 20-mm. antiaircraft gun.
It is conceded that Agent Jackson’s No. 12 does not specifically set out what constituted “Ammunition, fixed, N. O. I. for cannon,” or “Cartridges, small arm, blank or loaded, in boxes.” However, Supplement 1 of Agent Jackson’s No. 12, effective April 20,1942, did contain a rate for the shipment of cannons and described a cannon as follows: “Guns, N. O. I. (cannon, howitzers or mortars), bore under 6 inches but not less than % inch, not mounted, including equipment of mounts, other than wheeled.” “Yol., min. wt. 30,000 lbs.”
Twenty millimeters equal .787 inches; hence, a cannon of that caliber comes within the definition of a cannon as contained in Supplement 1 of Agent Jackson’s No. 12. If a 20-millimeter gun is a cannon, and not a small arm, then it necessarily follows that the ammunition for a 20-millimeter gun is “Ammunition, fixed, N. O. I. for cannon.”
The General Accounting Office on at least two occasions has rules that ammunition for a 20-millimeter gun was for a cannon: in a letter to the Traffic Manager of the M & M Transportation Company (plaintiff’s exhibit No. 7), and in a letter to Davidson Transfer and Storage Company (plaintiff’s exhibit No. 6).
The Interstate Commerce Commission so ruled in Docket I. & S, M-2586, introduced in this case as plaintiff’s exhibit No. 8. In this report it was said:
Prior to April 20,1942, the national classification, under the general heading of “Ordnance”, provided ratings on “guns, n. o. i. (cannon, howitzers or mortars) bore under 6 inches, but not less than 1 inch, mounted on mounts”. Effective on that date, the item containing the ratings was amended by providing that the bore of the guns described should be under 6 inches but not less than % inch.
*****
Since the reduction in the minimum bore, in the “cannon, etc.”, description, shipments of 20-millimeter guns have •been billed as “cannon”. “As the 20-millimeter gun clearly is a cannon, the ammunition therefore is cannon ammunition, and the present ratings for “Ammunition, fixed for cannon”, referred to hereinbefore, apply thereon. * * *
*590 Prior to 1941 the smallest cannon manufactured in this country had a caliber of 37 millimeters, but in 1941 the Navy Department began the manufacture of the Hispano-Suiza aircraft cannon, Birkigt design, which was a 20-millimeter cannon. The Navy Department in a book called “The Machine Gun,” in chapter 14 of part V, described such a gun as a cannon.
“Technical Manual 9-1900” issued by the War Department under date of July 3,1942, describes small arms ammunition as follows:
Small arms ammunition comprises the ammunition used in small-arm weapons — rifles, pistols, revolvers, and machine guns in calibers .22, .30, .45, and .50, and shotguns of 12-gage.
All of the above are smaller than the caliber of the 20 M/M gun. It defined ammunition for cannon as follows: “The term ‘artillery ammunition’ includes ammunition used in cannon of all calibers.”
Therefore, there seems to be no doubt that a 20-millimeter gun was not only described in the applicable tariff as a cannon, but that it has been so regarded by the General Accounting Office and by the Army and Navy since 1941, which was prior to the shipments in controversy.
If the 20-millimeter gun is a cannon, then it necessarily follows, as the Interstate Commerce Commission has ruled, that ammunition for this gun is ammunition for a cannon, and, therefore, comes within item 25 of Agent Jackson’s No. 12, to wit: “Ammunition, fixed, N. O. I., for cannon.”
If it does, then 75 per cent of the first class rate is applicable, by reason of the “Exceptions to National Motor Freight Classification No. 6, East.”
It is somewhat persuasive that Agent Jackson on June 25, 1943, issued Supplement No. 18 to Agent Jackson’s No. 12, effective August 7, 1943. This supplement provided that the ratings applicable to “Cartridges, small arm, blank or loaded, in boxes” would apply only on “Cartridges, 50-caliber (% inch) or smaller, and on shotgun shells.” Two shipments were made after the issuance of this supplement No. 18, and defendant concedes that plaintiff is entitled to recover for them the sum of $217.76.
*591 Defendant’s chief reliance is upon the fact that Agent Jackson’s No. 12 relative to item 23, “Ammunition, Explosive, Incendiary or Gas, Smoke or Tear Producing,” referred to Note 2, which stated that the shipment of such articles was “subject to rule 27.” Rule 27 reads:
Requirements for movement of explosives and dangerous articles other than explosives shall be governed by the Rules and Regulations as prescribed in Motor Carriers’ Explosives and Dangerous Articles Tariff No. 4, Agent C. F. Jackson’s MF-I. C. C. No. 11,1. C. C. No. 11, supplements thereto and reissues thereof.
This Motor Carriers’ Explosive and Dangerous Articles Tariff No. 4 set out rules for the packaging and marking of such articles, and defined ammunition for cannon as “* * * all fixed or separate loading ammunition of 37-mm (1y2 inches) caliber and larger which is fired from a cannon, gun, or mortar, as distinguished from ammunition fired from a device such as a pistol, revolver, rifle, shot gun, or similar firearm.”
Defendant says that this definition of ammunition for cannon contained in this tariff should be read into the tariff known as Agent Jackson’s No. 12. We do not think this follows. This tariff had nothing to do with rates for the carriage of ammunition; it was concerned only with the packaging and marking of it, and there is nothing to indicate that it was promulgated for the purpose of fixing rates for the carriage of ammunition.
We called attention above to the fact that the smallest cannon manufactured in tins country prior to 1941 was of a caliber of 37 millimeters. Motor Carriers’ Explosive and Dangerous Articles Tariff No. 4, which was issued December 20,1941, was evidently promulgated with that fact in mind. On the other hand, Supplement No. 1 to Agent Jackson’s No. 12 became effective April 20,1942. It seems clear that when the “Explosive and Dangerous Articles” tariff was issued, it could not have been contemplated that a later tariff would classify a 20-millimeter gun as a cannon. At any rate, this tariff has to do only with packaging and marking, and has nothing to do with rates. The rates are set out in Supplement No. 1 of Agent Jackson’s No. 12, and they clearly define *592 a 20-millimeter gun as a cannon and, therefore, the ammunition used by this gun must be cannon ammunition.
It results that plaintiff is entitled to recover the sum of $12,821.23. Judgment for this amount will be entered.
LaraihoRe, Judge; Madden, Judge; Littleton, Judge; and Jones, Chief Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a corporation organized and existing under the laws of the State of Maryland and is and was, at the time of the performance of the transportation services involved in this case, a motor common carrier of property in interstate commerce between points and places in the States of New York, New Jersey, Pennsylvania, Delaware, Maryland, and the District of Columbia.
2. Plaintiff during the period beginning August 12, 1942, and continuing through August 6, 1943, transported numerous shipments from Elkton, Maryland to Nixon, New Jersey, for the Navy Department, United States Government, which were described on the bills of lading as “Ammunition For Small Arms With Explosive Bullet (Loaded 20 M/M Shells) ” or as “Ammunition for Small Arms With Explosive Bullet (20 M/M H. E. I. AA Complete Bounds)”. Said shipments consisted of ammunition with explosive bullet for use in a gun known as “20 M/M Automatic Gun A/N — M2”.
3. For such transportation services, plaintiff billed the United States at the rate of 51 cents per hundred pounds, which was the class 75 rate (75 percent of the first-class rate) applicable on “Ammunition, Explosive for Cannon”, as published in Middle Atlantic States Motor Carrier Conference, Inc., Freight Tariffs, Series 10, MF-I. C. C. Nos. A-66 and A-106, which were effective June 30, 1942, and thereafter during the period involved in this suit. The original charges were paid on the basis of the rates billed by plaintiff.
The above-described tariffs, which are in evidence as Plaintiff’s Exhibits 1-A to 1-F inclusive, were participated in *593 by plaintiff and were designated as “Exceptions to National Motor Freight Classification No. 6, East.” The description of ammunition for cannon and the rating therefor was, for all purposes material to this action, the same in each of these tariffs from June 30, 1942 to a date beyond August 7, 1943. In the class 75 rating each had a general classification item entitled “Ammunition, Explosive, Incendiary or Gas, Smoke or Tear Producing” with a subclassification reading “For Cannon: Fixed or Semi-Fixed, N. O. I. in Packages.”
4. The tariffs above referred to were exceptions to “National Motor Freight Classification No. 6, Agent Jackson’s MF-I. C. C. No. 12,” hereinafter called Agent Jackson’s No. 12. This tariff became effective March 17, 1942, and was in effect throughout the period involved in this action. In the absence of any specific exceptions thereto, it was applicable to the shipments involved herein. The only difference between Agent Jackson’s No. 12 and the tariffs referred to in the preceding findings was that the latter showed that the rate to be paid on ammunition for cannon was to be only 75 percent of the first-class rate in Agent Jackson’s No. 12. The description of ammunition for cannon was the same in both Agent Jackson’s No. 12 and in the tariffs upon which plaintiff’s bills were based.
5. Agent Jackson’s No. 12 in Items 23, 25, 28, 29, and 30 contained the following:

Pursuant to such items the applicable rate on ammunition for cannon was two times the first-class rate published in the applicable rate tariffs when shipped in less than truckloads. The first-class rate applied' when shipments were made in *594 truckloads, minimum weight 30,000 pounds. The applicable rate on cartridges, small arm, blank or loaded, in boxes when shipped in truckloads was the fourth-class rate in the territory in which the shipments involved herein moved.
6. On or about June 19,1944, the Comptroller General of the United States ruled, in connection with a single shipment of 20-millimeter ammunition by plaintiff, File B-44794, that the lower classification rating of class 50, published in Agent Jackson’s MF-I. C. C. No. 12 for Item 30, “Cartridges, small arm, blank or loaded, in boxes” was applicable to such shipments. The payment at this rate was 34 cents per hundred pounds. After protest and appeal by plaintiff, the Assistant Comptroller General of the United States affirmed this ruling on October 25,1944, February 10, 1945, and September 25,1947, and again final appeal was denied August 4, 1949.
7. In accordance with the Comptroller General’s rulings from and after October 1945, plaintiff received from time to time claims from the General Accounting Office covering the described shipments, based on claimed application of the class 50, 34 cents per hundred pounds, rate to all such shipments. From and after October 1946 the defendant through the General Accounting Office deducted the amounts of such claims from other moneys rightfully due and owing by the defendant to the plaintiff on account of other transportation services rendered. The total amount of such deductions and the amount which plaintiff claims in this action is $12,603.47.
8. Agent Jackson’s MF-I. C. C. No. 12 contained certain rules and regulations governing shipments by motor carrier. Included in these rules were:

Rule %

See. 8.' Articles indicated as explosives or as dangerous articles in Motor Carriers’ Explosives and Dangerous Articles Tariff No. 4, Agent C. F. Jackson’s MF-I. C. C. No. 11,1. C. C. No. 11, must be described on the bill of lading as shown in that tariff and in addition should show the tariff description in connection with which the applicable rating or rate is published when such descriptions differ.
* * * * $

*595
Buie

Requirements for movement of explosives and dangerous articles other than explosives shall be governed by the Rules and Regulations as prescribed in Motor Carriers’ Explosives and Dangerous Articles Tariff No. 4, Agent C. F. Jackson’s MF-I. C. C. No. 11,1. C. C. No. 11, supplements thereto and reissues thereof.
9. Motor Carriers’ Explosive and Dangerous Articles Tariff No. 4, Agent C. F. Jackson’s MF-I. C. C. No. 11,1. C. C. No. 11, l’eferred to in Rules 2 and 27 set out in Finding 8, stated on the title page thereof that it was a tariff for “Publishing Interstate Commerce Commission Regulations For Transportation of Explosives and Other Dangerous Articles by Motor, Rail and Water Including Specifications For Shipping Containers.” This tariff provided in part as follows:

Bee. SJf Ammunition for Cannon

Ammunition for cannon is all fixed or separate loading ammunition of 87 mm (1 y2 inches) caliber and larger which is fired from a cannon, gun, or mortar, as distinguished from ammunition fired from a device such as a pistol, revolver, rifle, shot gun, or similar firearm. Seo. SB (a) Ammunition for cannon with explosive projectiles, gas projectiles, smohe projectiles, or incendiary projectiles or shell is fixed ammunition assembled in a unit consisting of the cartridge case containing the propelling charge and primer, and the projectile, or shell, fuzed, or unfuzed. Detonating fuzes, tracer fuzes, explosive or ignition devices, or fuze parts with explosives contained therein must not be assembled in ammunition or included in the same outside package unless shipped by, for, or to the War or Navy Department of the United States Government or unless of a type approved by the Bureau of Explosives.
# * * # #
(c) Marhvng.—Each outside package must be plainly marked “ammunition toe cannon with explosive PROJECTILES,” “AMMUNITION FOR CANNON WITH GAS PROJECTILES” (see sec. 402 (g) for required label) “ammunition FOE CANNON WITH SMOKE PROJECTILES,” Ol* “AMMUNITION FOE CANNON WITH INCENDIARY PROJECTILES” RS the CaS6 may be.
* * * * *
*596 Sec. 58 AMMUNITION FOR SMALL ARMS WITH EXPLOSIVE BULLETS
(a) Ammvmtion for small arms with explosive bullets is fixedi ammunition, to be used in machine guns or similar firearms and consists of a metallic cartridge case, the primer and the propelling charge, with explosive bullet with or without detonating fuze, the component parts necessary for one firing being all in one assembly. Detonating fuzes, tracer fuzes, explosive or ignition devices or fuze parts with explosives contained therein must not be assembled in ammunition or included in the same outside package unless shipped by, for, or to the War or Navy Department of the United States Government or unless of a type approved by the Bureau of Explosives.
* * * * *
(c) Marking. — Each outside package must be plainly marked “ammunition for small arms with explosive BULLETS.”
This tariff did not purport to classify any articles or commodities' for the purpose of assessing charges for their transportation.
10. The only shipments included in plaintiff’s petition that are now in controversy are those which were transported by plaintiff during the period December 8, 1942 to July 7, 1943, from Elkton, Maryland to Nixon, New Jersey. The issue with respect to such shipments is whether the 20-milli-meter ammunition transported by plaintiff should have been rated at the class 75 rate of 51 cents per hundred pounds applicable to shipments of “ammunition, Explosive for Cannon: Fixed or Semi-Fixed, N. O. I. in Packages,” as described in Plaintiff’s Exhibits 1-A to 1-F inclusive, or at the fourth-class rate of 34 cents per hundred pounds applicable to shipments of “ammunition, Explosive . . . Cartridges, small arm, blank or loaded, in boxes” described in Item 30, Agent Jackson’s MF-I. C. C. No. 12, which was used by the General Accounting Office as a basis for the settlement of plaintiff’s bills that are now in controversy.
11. On June 25, 1943, Supplement No. 18 to Agent Jackson’s MF-I. C. C. No. 12 was issued, effective August 7,1943. This supplement provided that the ratings which had theretofore applied to the shipment of Articles under Item 30, *597 “Cartridges, small arm, blank or loaded, in boxes”, would apply only on “cartridges, 50 caliber (% inch) or smaller, and on shotgun shells” after August 7, 1943. Two of the shipments included in plaintiff’s petition were made after August 7, 1943. With respect to these two shipments the parties agreed that plaintiff is entitled to recover charges based on a rating of 51 cents per hundred pounds applicable to the shipment of “ammunition, Explosive . . . for cannon” and that the sum which plaintiff is entitled to recover on the two shipments is $217.76. Prior to the issuance of Supplement No. 18, there was no rating classification which defined the caliber of either small-arms ammunition or ammunition for cannon.
12. National Motor Freight Classification No. 6, Agent Jackson’s MF-I. C. C. No. 12, Supplement No. 1, effective April 20, 1942, provided a rating applicable on “Guns, N. O. I. (cannon, howitzers or mortars), bore under 6 inches but not less than % inch, not mounted, including equipment of mounts, other than wheeled.”
Prior to the filing of plaintiff’s petition, the General Accounting Office issued rulings on the claims of three motor carriers with respect to the classification applicable to the shipment of the 20-millimeter gun and the rate to be charged therefor. In such rulings, the General Accounting Office held that the 20-millimeter gun should be rated in accordance with the above-quoted provision of Supplement No. 1 to National Motor Freight Classification No. 6. These rulings are in evidence as plaintiff’s Exhibits 5, 6, and 7. In the bills of lading, the guns were described as 20-millimeter machine guns and the carriers contended that they should have been rated and classified as machine guns. The position of the General Accounting Office, as set forth in its letter of November 15, 1945 to the M & M Transportation Company was as follows:
* * * * *
The shipment was described as 20 mm AA machine guns for S. A. ammunition, which guns are over % inch and therefore fall into the classification for cannon. The governing classification provides for cannon over % inch and less than 6 inches and the shipment should have been so described on the bill of lading.
$ ‡ ‡
*598 13. The ammunition in question consisted of a cylindrical brass case with primer, loaded with an explosive type projectile. The projectile alone is about 4 inches long and the complete shell, including the case and projectile, is about 7*4 inches in length. The diameter as indicated is such that the shell can be fired from a weapon having a bore of 20 millimeters or about .787 inches.
14. The 20-millimeter gun, an automatic rapid-fire weapon, is of comparatively recent development, the first one having been purchased for the United States Army in September 1937. The manufacture of the gun in this country was commenced in 1940. It was adapted from the French Hispano-Suiza aircraft gun, with engineering improvements intended to enhance its dependability. The basic gun first manufactured here was known in 1940 under United States Army nomenclature as “20 mm automatic gun, Ml”. After the entry of this country into the war, some further changes' were made to> meet British requirements. Later Army nomenclatures for the same weapon included “20 mm. Automatic Gun, M2” (1941), and “Gun, Automatic, 20 mm., M3” (1945). In 1942 the Army adopted a Navy nomenclature of a weapon then standard in the United States Navy, and known as the “20 mm. Machine Gun, MK IY”. During the period 1940-45, United States Army terminology for standard 20 mm. weapons was “Automatic Gun”. The term “cannon” was not used in the official U. S. Army nomenclature of any standard 20 mm. weapon. The guns were developed primarily for use in combat airplanes, and, when mounted on heavy bases, they have been used as defense against strafing and dive-bombing planes. They have also been utilized as antitank weapons. When used as a ground defense weapon against aircraft, or when fired from boats, the gun is operated from a stationary base.
15. A publication entitled “The Machine Gun” prepared for the Bureau of Ordnance, Department of the Navy, published in 1951, which deals with the history, evolution and development of manual, automatic and airborne repeating weapons, discusses' Automatic Aircraft Cannon in Part V of the book. Part Y consists of 22 chapters each devoted to a *599 discussion of automatic guns with a bore of 20 mm. or greater. All automatic guns with a bore of 20 mm. or greater are referred to therein as “cannon.” In the appendix automatic guns with a smaller bore than 20 millimeters are listed under the heading “Automatic Machine Guns.” The Birkigt Type 404 20-MM (Hispano-Suiza) Cannon is described in Chapter 14 of Part V.
The 20-mm. automatic gun AN-M1 and M2 is the His-pano-Suiza Aircraft cannon with certain modifications. Its development is set forth in detail in the chapter and it is referred to consistently as an aircraft cannon. There appears on page 576 the following:
The Eclipse Machine Division of Bendix Aviation Corp. started tooling for production and of 1,202 on order 500 were for the Navy. All of this lot were the Type Ml, as the American-made weapon was initially called, with delivery scheduled for May 1941.
Before the first cannon came off the assembly line, Army Ordnance ordered all procurement following the original contract be given the designation of M2. Subsequently this model was identified officially as “Gun, Automatic, 20-mm, AN-M2 (Aircraft).” The latter type would have a heavier receiver with slightly greater external dimensions. The M2 would weigh 112 pounds, as compared with 105 pounds for the Ml, and the point of balance would be 1.07 inches further forward. The weight difference was in the heavier constructed receiver. The reason for this receiver was that the gun was originally designed for engine mounting which did not require as much support as wing installations.
16. A technical manual designated “Technical Manual 9-1900” issued by the War Department and dated July 3, 1942, which was in use during the period the shipments moved, described small arms ammunition as “cartridges and shotgun shells used in small-arms weapons,” and artillery ammunition as “explosive and chemical ammunition used in cannon of all calibers.” The following appears on page 26 of that publication:
40 b. Small-arms ammunition comprises the ammunition used in small-arm weapons — rifles, pistols, revolvers, and machine guns in calibers .22, .30, .45, and .50, and shotguns of 12-gage.
*600 The following appears on page 49 of that publication:
76. general — a. Complete rovmd. — The term “artillery ammunition” includes ammunition used in cannon of all calibers. It includes complete rounds and components thereof. The complete round comprises all of the components necessary to fire the cannon once. These components are, in general, the fuzed projectile, the propelling charge, and the primer. Depending upon both the type of propelling charge and the method of loading into the eannon, complete rounds of artillery ammunition are known as fixed, semifixed, or separate loading.
17. During the years 1941, 1942, and 1943, the Drawing Specifications and Packing Unit of the Ammunition Branch, Industrial Division, Office of the Chief of Ordnance, prepared and issued drawings which regulated the packing and marking of boxes which were used for the shipment of 20-mm. ammunition. Until February 23,1942, the ammunition was described on the shipping box as “ammunition for cannon with_projectile.” On February 23, 1942, the description of the ammunition was changed on the packing box to read “ammunition for small arms with_ projectile.” On July 3, 1942, the marking was changed to read “ammunition for small arms with_bullet”, and this marking remained in use until April 29,1944.
The change of July 3, 1942, was made in order that the marking on the shipping boxes would conform to the provisions of Agent Topping’s Freight Tariff No. 4, which published regulations of the Interstate Commerce Commission for the transportation of explosives and other dangerous articles by rail carriers. The provisions of Agent Topping’s Freight Tariff No. 4 are identical with those quoted in Finding 9 from Agent C. F. Jackson’s MF-I. C. C. No. 11.
18. The regulations of the Interstate Commerce Commission, effective January 7, 1941, for the transportation of explosives and other dangerous articles by highway were published in 5 F. R. 4908-4959. These regulations contain the same provisions as have been quoted in Finding 9 above. Such regulations were in effect throughout the period involved in this action.
*601 19.The Encyclopedia Britannica, 1952 Edition, Volume 1, page 820, defines “ammunition” in part as follows:
* * * In general, cartridges tbe projectile elements of which are less than one inch in diameter are classified as small arms ammunition — the larger categories as artillery ammunition * * *.
The Encyclopedia in Volume 4, page 751, gives the following definition for “cannon”:
cannon, a gun or piece of ordnance. The word first found about 1400 * * *, has been commonly applied to any form of firearm fired from a carriage or fixed mounting, in contradistinction to “small arms,” which are fired without a rest or support. An exception must be made, however, in the case of machine gums, and the word as used in modern times may be defined as follows: “a piece of ordnance mounted upon a fixed or movable carriage and firing a projectile of greater calibre than 1 in. * * *
20. On November 6,1944, the National Classification Board of Motor Carriers ruled that ammunition for 20-millimeter guns is “ammunition for cannon.” On July 7, 1942, the Official Classification Committee of the railroads ruled that 20-mm. ammunition should be classified and rated as “cartridges, small arms loaded.” In the rail tariffs, which were in effect from March 7, 1942 to after August 7, 1943, the descriptions of ammunition for cannon and of cartridges for small arms were the same as those contained in Agent Jackson’s Tariff No. 12, quoted in Finding 5.
21. After Supplement 18 to Agent Jackson’s MF-I. C. C. No. 12 was issued, the Interstate Commerce Commission found in two cases involving motor common carriers that 20-mm. ammunition is ammunition for cannon. These decisions, which were issued February 12, 1946 and November 25, 1946, are in evidence as Plaintiff’s Exhibit 8. The following is quoted from the report and order of November 25, 1946:
The governing classifications under the generic heading of “Ammunition, Explosive, Incendiary or Gas, Smoke or Tear Producing,” provides ratings on “car *602 tridges, small arm, blank Or loaded”, and makes reference to a note providing that such ratings apply only on cartridges 50 caliber (y2 inches) or smaller and on shot gun shells.
The War, Department instructions for application of the consolidated freight classification to ordance [sic] material were not officially published at the time the involved shipments moved and are of little value in determining the issue here. As noted, the classification description of “cartridges, small arm, blank or loaded,” is subject to a note which restricts ratings to apply only on cartridges 50 caliber (y2 inch) or smaller and on shot gun shells. Accordingly, since 20 millimeter ammunition is utilized in a gun having a bore of approximately .787 inches, it must be concluded that the latter is cannon ammunition.
22. As shown by the preceding findings, there was no motor carrier freight classification in effect during the period involved here, which explicitly included 20-millimeter ammunition in either the definition of “ammunition, fixed N. O. I. for cannon” or in the definition of “ammunition, cartridges, small arm, blank or loaded.” The classifications in the tariffs relied upon by both parties show the ratings that are applicable to shipments of ammunition for cannon and of cartridges for small arms, but until August 7,1943, there was no motor carrier tariff in effect which clearly provided how 20-millimeter ammunition should be classified and rated.
23. The parties have agreed that if the shipments in controversy here should have been rated at the class 75 rate of 51 cents per hundred pounds, judgment should be entered for plaintiff in the sum of $12,603.47. This figure does not include the $217.76 referred to in Finding 11.
CONCLUSION OK LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States twelve thousand eight hundred twenty-one dollars and twenty-three cents ($12,821.23).